**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **BRYAN MURR,** ) | **CASE NO. 3:09CV2072** |
| ) | |
| Plaintiff, ) | **JUDGE DAVID A. KATZ** |
| ) | |
| v. ) | **MAGISTRATE JUDGE GREG WHITE** |
| ) | |
| **MICHAEL ASTRUE,** ) | |
| **Commissioner of Social Security,** ) | |
| ) | **REPORT AND RECOMMENDATION** |

Plaintiff, Bryan Murr ("Murr"), challenges the final decision of the Commissioner of Social Security, Michael J. Astrue ("Commissioner"), denying his claim for a Period of Disability ("POD"), Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Title II and Title XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 416(i), 423, 1381 *et seq*. The Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Court recommends the final decision of the Commissioner be affirmed.

**I. Procedural History**

On August 25, 2005, Murr filed applications for POD, DIB, and SSI alleging a disability onset date of June 30, 2005, and claiming that he was disabled due to a seizure disorder. His applications were denied both initially and upon reconsideration. Murr timely requested an administrative hearing.

On March 19, 2008, an administrative law judge (ALJ) held a hearing during which Murr, represented by counsel, testified. Charles McBee testified as the Vocational Expert ("VE"). On June 18, 2008, the ALJ found Murr was able to perform a significant number of jobs in the local economy and, therefore, was not disabled. The ALJ's decision became the final

decision of the Commissioner when the Appeals Council denied further review.

On appeal, Murr claims the ALJ erred by: (1) failing to give the opinion of Murr's treating physician appropriate weight; and (2) concluding that Murr retained the residual functional capacity ("RFC") to perform work in the national and local economy.

## II. Evidence

**Personal and Vocational Evidence**

Born on May 17, 1963, and age 42 at the time of his alleged disability onset date, Murr is a "younger" person under the social security regulations. *See* 20 C.F.R. § 404.1563(c), 419.963(c). Murr has a high school education and completed special training in machine trades. (Tr. 118.) He has past relevant work as a drywall installer for seventeen years. He last worked in 2005. (Tr. 252, 259.)

On June 18, 2002, Murr was evaluated by Sandy McLean, M.D., his primary care physician. (Tr. 168.) At that time, Murr reported that his medication was not controlling his seizures, and that he had stopped taking it. *Id.* Dr. McLean opined that his seizure disorder was partially controlled. *Id.* In July, 2002, Dr. McLean noted that Murr's seizure disorder was not well-controlled, and increased his Depakote prescription. (Tr. 167.) Murr returned a year later, at which time Dr. McLean reported that Murr had experienced fewer seizures in the past couple of months. *Id.* He also noted that Murr was receiving counseling and "not drinking lately." *Id.*

On March 25, 2003, Murr was seen at the Magruder Hospital emergency room ("ER") after experiencing a seizure at home. (Tr. 148.) Murr told ER doctors that he had experienced seizures since 1991 following a head injury. *Id.* Murr also reported that he had not taken his seizure medication for two days. *Id.* After conducting lab tests, his blood work showed his valproic acid level was non-existent.[1] (Tr. 150-151.) Upon examination, Murr was pleasant, alert, and oriented. His neurological functions were normal. (Tr. 150.) Murr was diagnosed with "seizure, recurrent, noncompliance" and discharged that day. *Id.*

---

[1]The Commissioner explains that the valproic acid level measures the chemicals in the body that may be involved in causing seizures and it is used to determine whether drug concentrations are in the therapeutic range. (Doc. No. 15 at 3.)

In January, 2004, Murr saw Dr. McLean and reported that he was having approximately one seizure per week. (Tr. 166.) Dr. McLean noted that Murr's seizure disorder is probably "as good as it is going to get right now." *Id.*

On June 19, 2005, Murr began serving a 90-day jail sentence for a DUI conviction. (Tr. 134, 254-255.) On June 21, 2005, after having a seizure in jail, he was transported to Magruder Hospital. (Tr. 140.) The ER records indicate that Murr was alert and oriented upon arrival. *Id.* Murr reported to hospital personnel that he had not been compliant with his medications because they were not controlling his seizures. *Id.* After receiving sutures for a laceration over his left eye, he was discharged in stable condition. (Tr. 141.)

On August 10, 2005, Murr was transported again to the Magruder Hospital ER after suffering another seizure while in jail. (Tr. 133.) A deputy witnessed Murr tremoring on the floor and described the seizure as lasting ten minutes. *Id.* Murr reported that he had been taking his medications. A blood test confirmed that his valproic level was therapeutic. (Tr. 134, 138.) Murr was stabilized and discharged. (Tr. 134-135.)

The next day, Murr was evaluated by neurologist Stephen Benedict, M.D., at the request of Dr. McLean. (Tr. 123 -125.) Murr reported that he had experienced seizures since 1991 which he described as initially occurring approximately two to four times per month and involving jerky-type movements. (Tr. 124.) He also reported that over the last three years, his seizures "progressed to involve loss of consciousness and generalized jerking and tonic-type movements." *Id.* Murr told Dr. Benedict that he had stopped taking his medications, but just two months ago started taking Depakote. *Id.* Since taking the medication, Murr noted no change in the frequency or character of his seizures. *Id.* Dr. Benedict assessed Murr with a generalized seizure disorder by history and, at the time, not well controlled on medications. *Id.* He recommended that Murr increase the dosage of Depakote to 750 mg. (Tr. 125.) He also recommended Murr undergo a routine EEG. *Id.*

In October 2005, Murr saw Dr. Benedict for a follow-up examination. (Tr. 121.) Murr reported that since the last appointment, he had experienced one seizure per week. *Id.* Dr. Benedict increased Murr's Depakote dosage. *Id.* Also, he noted that Murr was scheduled for an

EEG test the same day.[2]  *Id.*

On October 19, 2005, Dr. McLean completed a questionnaire for the Rehabilitation Services Commission reporting that Murr had generalized seizures, rarely with any loss of consciousness, usually occurring one time per week and for a duration of one to fifteen minutes. (Tr. 164-165.)  At the time, Dr. McLean opined that Murr's medication did not interfere with his functional ability or daily activities.  *Id.*  Dr. McLean noted that, in the past, Murr had a history of substance abuse and an inability to pay for medication or medical appointments, but that he had been compliant with his medication while he was incarcerated.  *Id.*  Dr. McLean also noted that on October 17, 2005, he increased his Depakote to 1 gram.  *Id.*

On October 30, 2005, while still incarcerated, Murr was seen in the Magruder Hospital ER after again experiencing a seizure lasting about five minutes.  (Tr. 127.)  The records note that upon his arrival Murr was alert and oriented.  *Id.*  Labwork showed that his $CO_2$ level was consistent with seizure activity.  (Tr. 132.)  He was discharged the same day in stable condition and told to follow-up with Dr. Benedict.  (Tr. 128.)

On November 2, 2005, Murr's valproic acid level was normal.  (Tr. 162.)  The next day, Murr saw Dr. Benedict and reported that he had three seizures since his last visit in October, including one since his last visit to the ER.  (Tr. 181.)  Dr. Benedict opined that Murr was experiencing breakthrough seizures and he again increased his Depakote prescription.  *Id.*  On November 21, 2005, Murr's valproic acid level was at a critical level.  (Tr. 161.)

Anton Freihofner, M.D., a state agency physician, after reviewing Murr's medical records, completed a physical RFC assessment dated November 9, 2005.  (Tr. 152-159.)  He opined that Murr had no exertional limitations, but that his seizures would limit him to only occasional climbing of ramps and stairs and no climbing of ladders, ropes, or scaffolds.  (Tr. 154.)  Dr. Freihofner noted that Murr had less than one generalized seizure per week based on his treatment records from 2002 until November 2005.  (Tr. 154.)  He further noted that Murr's continued seizure activity was due to inconsistent medication compliance and substance abuse.

---

[2]There is nothing in the record indicating the results of an EEG.

4

*Id.* In March 2006, Walter Holbrook, M.D., after reviewing Murr's medical records, affirmed Dr. Freihofner's assessment. (Tr. 243.)

On April 13, 2006, Murr reported to Dr. Benedict that he was having one seizure per week and that he could not afford his medication. (Tr. 180.) Dr. Benedict diagnosed generalized seizure disorder with breakthrough seizures. *Id.* He recommended further diagnostic testing. *Id.* Labwork showed Murr's valproic acid level in the normal range. (Tr. 187.) On May 11, 2006, Murr reported having one seizure since his April visit. (Tr. 179.) Dr. Benedict noted that his seizures were currently controlled. *Id.*

On July 20, 2006, Murr returned to Dr. Benedict and reported that he had experienced three seizures in the past week. (Tr. 178.) At this visit, Dr. Benedict opined that Murr's seizures were not well-controlled and prescribed Keppra, an anti-seizure medication. *Id.* In August 2006, Murr returned to Dr. Benedict and reported that he had not had a seizure since July. (Tr. 177.) Dr. Benedict noted that Murr's condition was better controlled. *Id.*

In October 2006, Murr reported to Dr. Benedict that he had seven seizures since the last visit, but that they were less severe. (Tr. 176.) Dr. Benedict, noting that the disorder was slowly improving, increased the Keppra dosage. *Id.* On January 25, 2007, Murr reported that he continued to have one seizure per week and Dr. Benedict once again increased the Keppra dose. (Tr. 175.)

In early March 2007, Murr was taken to the hospital after he had fallen on his left side. He acknowledged that he "had a whole bunch to drink." (Tr. 191-204.) X-rays revealed no fracture or dislocation. (Tr. 202.) He was given a sling for his left arm and discharged. (Tr. 203-204.)

On March 15, 2007, Murr reported to Dr. Benedict that he had four seizures during the last month. (Tr. 174.) Dr. Benedict opined that the seizure disorder was stable. *Id.* On May 3, 2007, Murr reported to Dr. Benedict that he had four seizures since he last saw him in March. The Keppra dose was again increased. (Tr. 173.)

On June 14, 2007, Murr reported to Dr. Benedict that he experienced four seizures the past month. The Keppra dose was, yet again, increased. (Tr. 172.) Murr's next appointment

5

with Dr. Benedict was August 2, 2007.  Murr reported six seizures, all while sleeping.  On two occasions, he had two seizures in one night.  (Tr. 171.)  At this time, the Keppra dose was increased to 1500 mg.  *Id.*

On September 20, 2007, Murr reported to Dr. Benedict that he had four nocturnal seizures.  (Tr. 170.)  Dr. Benedict assessed that the disorder had improved.  *Id.*  At his next appointment with Dr. Benedict, on January 10, 2008, Murr reported that he experienced "three seizures at a time, approximately one per week," lasting twenty seconds.  (Tr. 169).  Dr. Benedict concluded that the disorder had worsened and he changed the medication to Lamictal.  *Id.*

In March 2008, Dr. Benedict completed a Seizure RFC questionnaire in which he reported that Murr averaged four seizures per month lasting fifteen to twenty seconds.  (Tr. 210.)  He reported that Murr's last three seizures occurred in August, 2007, January 2008, and February 2008.  *Id.*  He further noted that Murr's medications during this time period included Depakote and Lamictal, which caused no side effects.  (Tr. 211.)  Dr. Benedict further believed that Murr would need to occasionally take unscheduled breaks during the day, until he was "clear" after the seizure.  (Tr. 212.)  Lastly, he stated that Murr was incapable of performing even "low stress" jobs and, that if he was working, Murr would likely miss more than four days per month as a result of his impairments or treatment.  *Id.*

**Hearing Testimony**

At the hearing on March 19, 2008, Murr testified to the following:

- He last worked as a drywaller approximately three years ago, a job he did for approximately 17 years.  (Tr. 252.)

- Prior to December 2005, he experienced seizures usually once a week.  (Tr. 253.)  In the last year, he averaged three seizures per week.  *Id.*

- He described his seizures as some being "unconscious to where I lose my extremities," but that it had been approximately a year since he had experienced this type.  *Id.*  He described his unconscious seizures as a lot of shaking, tensing, not being able to breath and a lot of chewing of the mouth.  *Id.*  He described his other seizures with the same tensing and chewing of the mouth and as occurring approximately three times per week.  *Id.*  His seizures normally average ten to twenty seconds.  *Id.*

- His doctor is still experimenting with his medications in order to gain control of

6

>   the seizures. (Tr. 254.)
>
> • His medications make him tired. *Id.*
>
> • Other than his seizures, there is nothing that would affect his ability to work. *Id.*
>
> • He had been in jail for ninety days in 2005. (Tr. 254-255.)
>
> • He lives with a friend and has helped the friend's mother with maintenance of the home. (Tr. 255.)
>
> • He agreed that he can function normally if not having a seizure, although he does not drive. *Id.*
>
> • Sometimes he experiences an aura or warning prior to a seizure. (Tr. 256.)
>
> • He first starting having seizures in approximately 1992 or 1993. *Id.*
>
> • After experiencing a seizure, he is sometimes exhausted and sore. (Tr. 258.)
>
> The ALJ posed the following hypothetical to the VE:
>
> Assume if you will an individual 44 years of age with a high school education and a past work history that you summarized for us. Assume that individual's limited to occupations which do not require working at heights, operating hazardous moving machinery. Assume further that the individual may lose focus and be unattentive to the task approximately one minute out of a week, or work week. With those limitations, would that individual be capable of any of Mr. Murr's past employment either as he performed it or as it is usually performed in the national economy?

(Tr. 259.)

The VE testified that such an individual could not perform Murr's past relevant work. *Id.* The VE did, however, identify several jobs that the hypothetical person could perform, including inspector hand packager (3,000-4,000 local jobs), folder of garments (750-1,000 local jobs), and bagger of garments (300 to 400 local jobs). *Id.*

A second hypothetical was posed to the VE assuming an individual the same age, education, and work experience and who had limitations consistent with Murr's testimony. (Tr. 260.) The VE testified "that individual would not be capable of his past work or any other work." *Id.*

In response to questions from Murr's attorney, the VE testified that most jobs permit unscheduled breaks, but not absences of four days per month as predicted in Dr. Benedict's questionnaire. *Id.*; (*see also* Tr. 212.)

7

### III. Standard for Disability

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).[3]

A claimant is entitled to POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

Murr was insured on his alleged disability onset date, June 30, 2005, and remained insured through December 30, 2005. (Tr. 13.) Therefore, in order to be entitled to POD and DIB, Murr must establish a continuous twelve-month period of disability commencing between the disability onset date and December 30, 2005. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

A claimant may also be entitled to receive SSI benefits when he establishes disability within the meaning of the Act. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and

---

[3]The entire five-step process entails the following: First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time he seeks disability benefits. Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. A "severe impairment" is one which "significantly limits . . . physical or mental ability to do basic work activities." Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education, or work experience. 20 C.F.R. §§ 404.1520(d) and 416.900(d)) (2009). Fourth, if the claimant's impairment does not prevent him from doing his past relevant work, the claimant is not disabled. For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).

resource limitations.  20 C.F.R. §§ 416.1100 and 416.1201.

### IV.  Summary of Commissioner's Decision

After considering the entire record, the ALJ made the following findings regarding Murr:

1. He has not engaged in substantial gainful activity since June 30, 2005, the alleged onset date.

2. He has a seizure disorder, which is a severe impairment.

3. He does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

4. He has the residual functional capacity ("RFC") to perform work at any exertional level in which he would not be exposed to dangerous heights or hazardous moving machinery.  He would also lose focus and be inattentive to work tasks for about one minute out of any given work week.

5. He is unable to perform past relevant work.

6. Considering his age, education, work experience, and RFC, jobs exist in significant numbers in the national economy that he could perform.

7. He has not been under a "disability," as defined in the Act from June 30, 2005, through the date of the decision.

(Tr. 15-20.)

### V.  Standard of Review

This Court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec*., 348 F.3d 124, 125 (6th Cir. 2003)("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983).  Substantial evidence has been defined as "[e]vidence which a reasoning mind would accept as sufficient to support a particular conclusion.  It consists of more than a mere scintilla of evidence but may be somewhat less than

a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1996); *see also Richardson v. Perales*, 402 U.S. 389 (1971).

The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen*, 800 F.2d 533, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence reasonably support[s] the conclusion reached. *See Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).") This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (*citing Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must consider whether the proper legal standard was applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations or failure to provide the reviewing court with a sufficient basis to determine that the commissioner applied the correct legal standards are grounds for reversal where such failure prejudices a claimant on the merits or deprives a claimant of a substantial right. *See White v. Comm'r of Soc. Sec.*, 572 F.3d 272 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006).

### VI. Analysis

Murr claims the ALJ erred by: (1) failing to give Murr's treating physician's opinion appropriate weight; and (2) concluding that Murr retained the RFC to perform work in the national and local economy.

**Treating Physician**

Murr argues in his brief that the ALJ improperly discounted his treating physician's opinion. Dr. Benedict opined in his Seizure RFC that Murr is incapable of even "low stress" jobs as "anything could trigger a seizure," that Murr's seizures would cause him to miss approximately four days of work per month, and that they also would interfere with work

10

activity of coworkers. (Doc. No. 12 at 10.) Murr claims Dr. Benedict's RFC is supported by the other medical evidence, i.e., laboratory tests, emergency room reports, the primary care physician's reports, lay witnesses, and Murr's own records. (Doc. No. 12 at 11.) He argues, therefore, that the ALJ's decision did not properly give Dr. Benedict's opinion controlling weight.

Murr also contends that his seizures are not alcohol-related as they continued even while he was incarcerated and had not consumed alcohol. (Doc. 12 at 12.) Furthermore, he asserts that during his period of incarceration, he was compliant with his medications, yet the seizures continued. *Id.* Finally, he argues that there is no medical support for the ALJ's finding that Murr was noncompliant with his medical treatment. (Doc. No. 12 at 13.)

The Commissioner contends that the ALJ properly discounted Dr. Benedict's opinion by finding that a portion of Dr. Benedict's RFC report went beyond what the record would support. For instance, suggesting that Murr would miss four or more days of work per month, that he would require extra supervision, and that he would need to occasionally take unscheduled breaks, was far more extreme than the frequency and severity of Murr's reported seizures would justify. (Doc. No. 15 at 13, 14.) The Commissioner also argues that it is unlikely Murr would be absent four or more days a month because of a fifteen-to-twenty second episode once a week. (Doc. No. 15 at 14.)

Under Social Security regulations, the opinion of a treating physician is entitled to controlling weight if such opinion (1) "is well-supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record." *Meece v. Barnhart*, 192 F. App'x 456, 560 (6th Cir. 2006) (*quoting* 20 C.F.R. § 404.1527(d)(2)). "[A] finding that a treating source medical opinion . . . is inconsistent with the other substantial evidence in the case record means only that the opinion is not entitled to 'controlling weight,' not that the opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399 (6th Cir. 2009) (*quoting* Soc. Sec. Rul. 96-2p, 1996 SSR LEXIS 9 at *9); *Meece*, 192 F. App'x at 460-61 (Even if not entitled to controlling weight, the opinion of a treating physician is generally entitled to more weight than other medical opinions.) Furthermore,

11

"[t]reating source medical opinions are still entitled to deference and must be weighed using all of the factors provided in 20 C.F.R. § 404.1527 and 416.927." *Blakley*, 581 F.3d at 408.[4]

Nonetheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581 F.3d at 406 ("It is an error to give an opinion controlling weight simply because it is the opinion of a treating source if it is not well-supported by medically acceptable clinical and laboratory diagnostic techniques or if it is inconsistent with other substantial evidence in the case record.") (*quoting* SSR 96-2p). Moreover, the ALJ is not bound by conclusory statements of a treating physician that a claimant is disabled, but may reject determinations of such a physician when good reasons are identified for not accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383, 391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(e)(1), the Social Security Commissioner makes the determination whether a claimant meets the statutory definition of disability. This necessarily includes a review of all the medical findings and other evidence that support a medical source's statement that one is disabled. "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id.* It is the Commissioner who must make the final decision on the ultimate issue of disability. *Duncan*, 801 F.2d at 855; *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Watkins v. Schweiker*, 667 F.2d 954, 958 n. 1 (11th Cir. 1982).

The ALJ discounted Dr. Benedict's opinion, stating as follows:

As for the opinion evidence, it is noted that Dr. Benedict stated that the claimant

---

[4] Pursuant to 20 C.F.R. § 404.1527(d)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

>would be absent from any scheduled work activity four or more days per month and assigned other significant limitations such as frequent unscheduled absences based on the seizure disorder. However, Dr. Benedict's cited limitations are far more extreme than the frequency and severity of reported seizures would justify. Moreover, Dr. Benedict stated that the claimant was compliant with medications and there was no history of alcohol or drug abuse. Neither of these statements are at all accurate or consistent with the rest of the medical record, while the claimant only saw Dr. Benedict for the first time two weeks before applying for disability. The undersigned is therefore impelled to discount Dr. Benedict and give greater weight to the State agency findings.
>
>Aside from Dr. Benedict's opinion, there is no other treating or examining source evidence to suggest disability. Indeed, the reports from Drs. Omley and McLean as well as those records from Magruder Hospital suggest strongly that it was felt that the claimant's primary problem relating to his seizures was simple noncompliance with prescribed seizure medications. Such opinions would not be supportive of a disability finding.

(Tr. 18.)

Even though the ALJ did not specifically cite 20 C.F.R. § 404.1527(d)(2) when discounting Dr. Benedict's opinion as not supported by substantial evidence, he considered the relevant factors. *See Friend v. Comm'r of Soc. Sec.*, 2010 WL 1725066, * 8, Case No. 09-3889 (6th Cir. Apr. 28, 2010) ("If the ALJ's opinion permits the claimant and a reviewing court a clear understanding of the reasons for the weight given a treating physician's opinion, strict compliance with the rule may sometimes be excused.") The ALJ noted that Murr began seeing Dr. Benedict the same month he filed his application for benefits. (Tr. 16.) The neurological and physical examinations were normal. *Id.* Furthermore, as the ALJ noted, Murr's seizure disorder was not confirmed by EEG, CT scan, or other positive neurological evidence. (Tr. 17.) Dr. Benedict advised Murr to have an EEG, but the doctor's follow-up notes indicate it was not conducted. (Tr. 16.) Additionally, there was evidence that Murr had a history of substance abuse as he was incarcerated for a DUI during 2005. In March 2007, there is evidence of continued substance abuse. He presented at Magruder Hospital after having "a whole bunch to drink" and falling on his right shoulder at least three times. (Tr. 191.) The record indicates that Murr admitted to drinking alcohol frequently and in large amounts. *Id.*

Furthermore, there was evidence that Murr was not always compliant with his medications. On several occasions, he told the ER staff or his doctors that he did not take the medication as it did not help his seizures. For example, on May 23, 2003, Murr reported to the

13

ER staff that he had not taken his medication for two days. (Tr. 148.) Labwork showed his valproic acid level to be non-existent. (Tr. 150-151.) On June 21, 2005, Dr. Magill noted that Murr "does not take meds." (Tr. 140-141.) On August 11, 2005, Dr. Benedict noted that Murr "prior to two months ago, had stopped his medications and noticed no change in his seizure frequency." (Tr. 124.)

While the ALJ did not specifically address the State Agency findings, it is clear that the opinions of the state agency doctors, based on records from 2002 until November 2005, were consistent with other treating physician's opinion. The state agency doctors concluded that Murr suffered one generalized seizure per week, and that his continued seizure activity was due to inconsistent medicine compliance and substance abuse. (Tr. 154.)

Murr also argues that the State Agency findings did not include Dr. Benedict's records after November 2005, which contained most of the records detailing his weekly seizures. Murr contends, therefore, that the ALJ did not rely on the complete record to reach his conclusion. The Commissioner counters that the subsequent record evidence still shows that Murr averaged one seizure per week, and, thus, the ALJ was entirely reasonable to rely on the state agency doctors' opinions. (Doc. No. 15 at 12.)

As to the number of seizures experienced, the ALJ noted that Dr. Benedict, himself, reported that Murr had, on average, four seizures a month. Dr. Benedict further stated that the seizures posed "at most a temporary loss of focus," as they lasted only about fifteen to twenty seconds. (Tr. 18.) Further, the record contains other evidence showing Murr averaged one seizure per week.[5] Additionally, the ALJ noted that Murr worked as a drywall installer until 2005, even though he stated at the hearing that he had a history of seizures since 1991.[6]

---

[5]Murr argues that the ALJ misstated the evidence when the ALJ, relying on Dr. Benedict's RFC report, stated that the dates of Murr's last three seizures were 8/07, 1/3/08 and 2/28/08. The Commissioner acknowledges, however, that the record shows that Murr had, on average, one seizure per week. (Tr. 165, 210, 253-254.)

[6]The record shows that Murr visited Dr. McLean in 2002 reporting seizures. (Tr. 168.) Dr. McLean never opined that the seizures would prevent Murr from working. In fact, Murr continued to work until 2005.

14

The Court finds that there is substantial evidence in the record for the ALJ to have concluded that Murr, on average, suffered only one seizure per week lasting fifteen to twenty seconds with no residual side effects. (Tr. 18, 253-254.) First, Murr's treating specialist stated so in the RFC. Additionally, Murr's own statements made to Dr. McLean, Dr. Benedict, and ER medical personnel when reporting his history, support the fact that he experienced seizures averaging one time per week lasting only fifteen to twenty seconds. The record provides substantial support for the treatment accorded to Dr. Benedict's opinion by the ALJ.

**Residual Functional Capacity**

Murr next argues that the ALJ did not consider all the evidence in calculating Murr's RFC. The Commissioner contends that the ALJ's RFC finding is within the "zone of choices." *See Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

An RFC is the assessment of a claimant's maximum remaining capacity to perform work-related activities despite the physical and mental limitations caused by the claimant's disability. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). The RFC circumscribes "the claimant's residual abilities or what a claimant can do, not what maladies a claimant suffers from–though the maladies will certainly inform the ALJ's conclusion about the claimant's abilities." *Saad v. Comm'r of Soc. Sec.*, 2009 WL 454650 *9, No. 07-15506 (E.D. Mich. Feb. 24, 2009) (*quoting Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 240 (6th Cir. 2002). Significantly, a severe impairment does not equate to disability. Rather, a "claimant's severe impairment may or may not affect his or her functional capacity to do work. One does not necessarily establish the other." *Saad* (*quoting Yang v. Comm'r of Soc. Sec.*, 2004 WL 1765480, *5 (E.D. Mich. 2004).

The ALJ calculated Murr's RFC as follows:

> Upon careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform work at any exertional level which would not expose him to dangerous heights or hazardous moving machinery. He would also lose focus and be inattentive to work tasks for about one minute out of any given work week.
>
> * * *
>
> Finally, although the undersigned has given considerable weight to the claimant's self-reported limitations in the functional capacity assessment, it appears that these episodes impose at most a temporary loss of focus lasting about fifteen

>seconds and from which he recovers entirely within another fifteen to twenty seconds (See: Exhibit 10F). This would not be a condition which would be expected to entirely preclude work, particularly if such work could be performed without exposure to hazards or dangerous heights.
>
>With regard to Social Security Ruling 96-7p criteria, it is particularly noted that the claimant alleges neither pain nor any limitations at all aside from seizures. Again, his lack of compliance with medications does not contribute to his allegations of disability while it is noted that there are no records of any seizures at all prior to 2003 although he said that he had been suffering from this condition since 1991.
>
>Again, the claimant was working at a substantial gainful activity level in 2004 and there is no evidence of any other seizure or initiation of treatment until 2005, shortly before he applied for disability.

(Tr. 17-18.)

In determining Murr's RFC, the ALJ did not discuss Murr's exertional limitations, because none were at issue. Neither Murr's treating physicians nor the state agency physicians found any exertional limitations and Murr did not allege any. Except for seizure related precautions, such as being exposed to dangerous machines or heights, Murr was capable of performing work at all exertional levels.

The ALJ next determined, based on the VE's testimony, that Murr could not perform his past relevant work, but had the RFC to perform a significant number of jobs in the national and local economy. (Tr. 19.) The VE testified that considering Murr's age, education, work experience, and RFC, he could perform the duties of a hand packager (4,000 in Northwestern Ohio), a folding job (1000), or a bagging job (400). *Id.* The VE testified that the jobs were consistent with the Dictionary of Occupational Titles. *Id.*

Moreover, the ALJ found Murr's self-reported limitations to be not entirely credible and inconsistent with the medical evidence in the record. The ALJ is only required to incorporate the limitations that he finds credible into a hypothetical question. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993). This obligation to assess credibility extends to the claimant's subjective complaints such that the ALJ "can present a hypothetical to the VE on the basis of his own assessment if he reasonably deems the claimant's testimony to be inaccurate." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003). An ALJ's findings based on the credibility of an applicant are to be accorded great weight and deference,

16

particularly since the ALJ is charged with the duty of observing a witness's demeanor and credibility. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 531 (6th Cir. 1997).

Here, the ALJ stated that Murr's "medically determinable impairment could reasonably be expected to produce the alleged symptoms." (Tr. 17.)  However, the ALJ found that Murr's statements at the hearing concerning the "intensity, duration and limiting effects" were not entirely credible.  *Id*.  The ALJ relied upon evidence that the "episodes impose[d] at most a temporary loss of focus lasting about fifteen seconds and from which he recover[ed] entirely within another fifteen to twenty seconds.  (See Exhibit 10F)."  (Tr. 18.)  The ALJ reasonably concluded that this is not a condition that entirely precludes Murr from work, particularly if the work could be performed without exposure to hazards or dangerous heights.  *Id*.

The ALJ's decision is supported by substantial evidence as it is within the "zone of choice" allowing considerable latitude to administrative decision makers. *See Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994).

### VII.  Decision

For the foregoing reasons, the Court finds the decision of the Commissioner supported by substantial evidence.  Accordingly, the Court recommends that the decision of the Commissioner be affirmed and judgment entered in favor of the Defendant.

IT IS SO ORDERED.

                                         s/ Greg White
                                         United States Magistrate Judge

Date:   June 15, 2010

**OBJECTIONS**
**Any objection to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981).  *See also Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**