IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
WESTERN DIVISION

BRYAN MURR,

                Plaintiff,         Case No. 3:09 CV 2072

   -vs-

                                      MEMORANDUM OPINION

COMMISSIONER OF SOCIAL
SECURITY,

                Defendant.

KATZ, J.

This matter is before the Court on the Report and Recommendation ("R&R") of United States Magistrate Judge Greg White (Doc. 16), Plaintiff Brian Murr's ("Plaintiff") objections to the R&R (Doc. 17), and Defendant Commissioner of Social Security's ("Commissioner") reply (Doc. 20). In accordance with *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981), this Court has made a *de novo* determination of those of the Magistrate's findings to which Plaintiff objects.

**I. Background**

The relevant background for this case as described in the June 15 R&R of Magistrate Judge White (Doc. 16) is accurate and hereby incorporated as follows:

**I. Procedural History**

On August 25, 2005, Murr filed applications for POD, DIB, and SSI alleging a disability onset date of June 30, 2005, and claiming that he was disabled due to a seizure disorder. His applications were denied both initially and upon reconsideration. Murr timely requested an administrative hearing.

On March 19, 2008, an administrative law judge (ALJ) held a hearing during which Murr, represented by counsel, testified. Charles McBee testified as the Vocational Expert ("VE"). On June 18, 2008, the ALJ found Murr was able to perform a significant number of jobs in the local economy and, therefore, was not disabled. The ALJ's decision became the final decision of the Commissioner when the Appeals Council denied further review.

On appeal, Murr claims the ALJ erred by: (1) failing to give the opinion of Murr's treating physician appropriate weight; and (2) concluding that Murr

retained the residual functional capacity ("RFC") to perform work in the national and local economy.

## II. Evidence

**Personal and Vocational Evidence**

Born on May 17, 1963, and age 42 at the time of his alleged disability onset date, Murr is a "younger" person under the social security regulations. *See* 20 C.F.R. § 404.1563(c), 419.963(c). Murr has a high school education and completed special training in machine trades. (Tr. 118.) He has past relevant work as a drywall installer for seventeen years. He last worked in 2005. (Tr. 252, 259.) On June 18, 2002, Murr was evaluated by Sandy McLean, M.D., his primary care physician. (Tr. 168.) At that time, Murr reported that his medication was not controlling his seizures, and that he had stopped taking it. *Id.* Dr. McLean opined that his seizure disorder was partially controlled. *Id.* In July, 2002, Dr. McLean noted that Murr's seizure disorder was not well-controlled, and increased his Depakote prescription. (Tr. 167.) Murr returned a year later, at which time Dr. McLean reported that Murr had experienced fewer seizures in the past couple of months. *Id.* He also noted that Murr was receiving counseling and "not drinking lately." *Id.*

On March 25, 2003, Murr was seen at the Magruder Hospital emergency room ("ER") after experiencing a seizure at home. (Tr. 148.) Murr told ER doctors that he had experienced seizures since 1991 following a head injury. *Id.* Murr also reported that he had not taken his seizure medication for two days. *Id.* After conducting lab tests, his blood work showed his valproic acid level was non-existent.[1] (Tr. 150-151.) Upon examination, Murr was pleasant, alert, and oriented. His neurological functions were normal. (Tr. 150.) Murr was diagnosed with "seizure, recurrent, noncompliance" and discharged that day. *Id.*

In January, 2004, Murr saw Dr. McLean and reported that he was having approximately one seizure per week. (Tr. 166.) Dr. McLean noted that Murr's seizure disorder is probably "as good as it is going to get right now." *Id.*

On June 19, 2005, Murr began serving a 90-day jail sentence for a DUI conviction. (Tr. 134, 254-255.) On June 21, 2005, after having a seizure in jail, he was transported to Magruder Hospital. (Tr. 140.) The ER records indicate that Murr was alert and oriented upon arrival. *Id.* Murr reported to hospital personnel that he had not been compliant with his medications because they were not controlling his seizures. *Id.* After receiving sutures for a laceration over his left eye, he was discharged in stable condition. (Tr. 141.)

On August 10, 2005, Murr was transported again to the Magruder Hospital ER after suffering another seizure while in jail. (Tr. 133.) A deputy

---

[1] The Commissioner explains that the valproic acid level measures the chemicals in the body that may be involved in causing seizures and it is used to determine whether drug concentrations are in the therapeutic range. (Doc. No. 15 at 3.)

2

witnessed Murr tremoring on the floor and described the seizure as lasting ten minutes. *Id.* Murr reported that he had been taking his medications. A blood test confirmed that his valproic level was therapeutic. (Tr. 134, 138.) Murr was stabilized and discharged. (Tr. 134-135.)

The next day, Murr was evaluated by neurologist Stephen Benedict, M.D., at the request of Dr. McLean. (Tr. 123 -125.) Murr reported that he had experienced seizures since 1991 which he described as initially occurring approximately two to four times per month and involving jerky-type movements. (Tr. 124.) He also reported that over the last three years, his seizures "progressed to involve loss of consciousness and generalized jerking and tonic-type movements." *Id.* Murr told Dr. Benedict that he had stopped taking his medications, but just two months ago started taking Depakote. *Id.* Since taking the medication, Murr noted no change in the frequency or character of his seizures. *Id.* Dr. Benedict assessed Murr with a generalized seizure disorder by history and, at the time, not well controlled on medications. *Id.* He recommended that Murr increase the dosage of Depakote to 750 mg. (Tr. 125.) He also recommended Murr undergo a routine EEG. *Id.*

In October 2005, Murr saw Dr. Benedict for a follow-up examination. (Tr. 121.) Murr reported that since the last appointment, he had experienced one seizure per week. *Id.* Dr. Benedict increased Murr's Depakote dosage. *Id.* Also, he noted that Murr was scheduled for an EEG test the same day.[2] *Id.*

On October 19, 2005, Dr. McLean completed a questionnaire for the Rehabilitation Services Commission reporting that Murr had generalized seizures, rarely with any loss of consciousness, usually occurring one time per week and for a duration of one to fifteen minutes. (Tr. 164-165.) At the time, Dr. McLean opined that Murr's medication did not interfere with his functional ability or daily activities. *Id.* Dr. McLean noted that, in the past, Murr had a history of substance abuse and an inability to pay for medication or medical appointments, but that he had been compliant with his medication while he was incarcerated. *Id.* Dr. McLean also noted that on October 17, 2005, he increased his Depakote to 1 gram. *Id.*

On October 30, 2005, while still incarcerated, Murr was seen in the Magruder Hospital ER after again experiencing a seizure lasting about five minutes. (Tr. 127.) The records note that upon his arrival Murr was alert and oriented. *Id.* Labwork showed that his $CO_2$ level was consistent with seizure activity. (Tr. 132.) He was discharged the same day in stable condition and told to follow-up with Dr. Benedict. (Tr. 128.)

On November 2, 2005, Murr's valproic acid level was normal. (Tr. 162.) The next day, Murr saw Dr. Benedict and reported that he had three seizures since his last visit in October, including one since his last visit to the ER. (Tr. 181.) Dr. Benedict opined that Murr was experiencing breakthrough seizures and he again

---

[2] There is nothing in the record indicating the results of an EEG.

3

increased his Depakote prescription. *Id.* On November 21, 2005, Murr's valproic acid level was at a critical level. (Tr. 161.)

Anton Freihofner, M.D., a state agency physician, after reviewing Murr's medical records, completed a physical RFC assessment dated November 9, 2005. (Tr. 152-159.) He opined that Murr had no exertional limitations, but that his seizures would limit him to only occasional climbing of ramps and stairs and no climbing of ladders, ropes, or scaffolds. (Tr. 154.) Dr. Freihofner noted that Murr had less than one generalized seizure per week based on his treatment records from 2002 until November 2005. (Tr. 154.) He further noted that Murr's continued seizure activity was due to inconsistent medication compliance and substance abuse. *Id.* In March 2006, Walter Holbrook, M.D., after reviewing Murr's medical records, affirmed Dr. Freihofner's assessment. (Tr. 243.)

On April 13, 2006, Murr reported to Dr. Benedict that he was having one seizure per week and that he could not afford his medication. (Tr. 180.) Dr. Benedict diagnosed generalized seizure disorder with breakthrough seizures. *Id.* He recommended further diagnostic testing. *Id.* Labwork showed Murr's valproic acid level in the normal range. (Tr. 187.) On May 11, 2006, Murr reported having one seizure since his April visit. (Tr. 179.) Dr. Benedict noted that his seizures were currently controlled. *Id.*

On July 20, 2006, Murr returned to Dr. Benedict and reported that he had experienced three seizures in the past week. (Tr. 178.) At this visit, Dr. Benedict opined that Murr's seizures were not well-controlled and prescribed Keppra, an anti-seizure medication. *Id.* In August 2006, Murr returned to Dr. Benedict and reported that he had not had a seizure since July. (Tr. 177.) Dr. Benedict noted that Murr's condition was better controlled. *Id.*

In October 2006, Murr reported to Dr. Benedict that he had seven seizures since the last visit, but that they were less severe. (Tr. 176.) Dr. Benedict, noting that the disorder was slowly improving, increased the Keppra dosage. *Id.* On January 25, 2007, Murr reported that he continued to have one seizure per week and Dr. Benedict once again increased the Keppra dose. (Tr. 175.)

In early March 2007, Murr was taken to the hospital after he had fallen on his left side. He acknowledged that he "had a whole bunch to drink." (Tr. 191-204.) X-rays revealed no fracture or dislocation. (Tr. 202.) He was given a sling for his left arm and discharged. (Tr. 203-204.)

On March 15, 2007, Murr reported to Dr. Benedict that he had four seizures during the last month. (Tr. 174.) Dr. Benedict opined that the seizure disorder was stable. *Id.* On May 3, 2007, Murr reported to Dr. Benedict that he had four seizures since he last saw him in March. The Keppra dose was again increased. (Tr. 173.)

On June 14, 2007, Murr reported to Dr. Benedict that he experienced four seizures the past month. The Keppra dose was, yet again, increased. (Tr. 172.) Murr's next appointment with Dr. Benedict was August 2, 2007. Murr reported six seizures, all while sleeping. On two occasions, he had two seizures in one night. (Tr. 171.) At this time, the Keppra dose was increased to 1500 mg. *Id.*

4

On September 20, 2007, Murr reported to Dr. Benedict that he had four nocturnal seizures. (Tr. 170.) Dr. Benedict assessed that the disorder had improved. *Id.* At his next appointment with Dr. Benedict, on January 10, 2008, Murr reported that he experienced "three seizures at a time, approximately one per week," lasting twenty seconds. (Tr. 169). Dr. Benedict concluded that the disorder had worsened and he changed the medication to Lamictal. *Id.*

In March 2008, Dr. Benedict completed a Seizure RFC questionnaire in which he reported that Murr averaged four seizures per month lasting fifteen to twenty seconds. (Tr. 210.) He reported that Murr's last three seizures occurred in August, 2007, January 2008, and February 2008. *Id.* He further noted that Murr's medications during this time period included Depakote and Lamictal, which caused no side effects. (Tr. 211.) Dr. Benedict further believed that Murr would need to occasionally take unscheduled breaks during the day, until he was "clear" after the seizure. (Tr. 212.) Lastly, he stated that Murr was incapable of performing even "low stress" jobs and, that if he was working, Murr would likely miss more than four days per month as a result of his impairments or treatment. *Id.*

**Hearing Testimony**

At the hearing on March 19, 2008, Murr testified to the following:

- He last worked as a drywaller approximately three years ago, a job he did for approximately 17 years. (Tr. 252.)
- Prior to December 2005, he experienced seizures usually once a week. (Tr. 253.) In the last year, he averaged three seizures per week. *Id.*
- He described his seizures as some being "unconscious to where I lose my extremities," but that it had been approximately a year since he had experienced this type. *Id.* He described his unconscious seizures as a lot of shaking, tensing, not being able to breath and a lot of chewing of the mouth. *Id.* He described his other seizures with the same tensing and chewing of the mouth and as occurring approximately three times per week. *Id.* His seizures normally average ten to twenty seconds. *Id.*
- His doctor is still experimenting with his medications in order to gain control of the seizures. (Tr. 254.)
- His medications make him tired. *Id.*
- Other than his seizures, there is nothing that would affect his ability to work. *Id.*
- He had been in jail for ninety days in 2005. (Tr. 254-255.)
- He lives with a friend and has helped the friend's mother with maintenance of the home. (Tr. 255.)
- He agreed that he can function normally if not having a seizure, although he does not drive. *Id.*
- Sometimes he experiences an aura or warning prior to a seizure. (Tr. 256.)
- He first starting having seizures in approximately 1992 or 1993. *Id.*
- After experiencing a seizure, he is sometimes exhausted and sore. (Tr. 258.)

The ALJ posed the following hypothetical to the VE:

> Assume if you will an individual 44 years of age with a high school education and a past work history that you summarized for us. Assume that individual's limited to occupations which do not require working at heights, operating hazardous moving machinery. Assume further that the individual may lose focus and be unattentive to the task approximately one minute out of a week, or work week. With those limitations, would that individual be capable of any of Mr. Murr's past employment either as he performed it or as it is usually performed in the national economy?
> (Tr. 259.)
> The VE testified that such an individual could not perform Murr's past relevant work. *Id.* The VE did, however, identify several jobs that the hypothetical person could perform, including inspector hand packager (3,000-4,000 local jobs), folder of garments (750-1,000 local jobs), and bagger of garments (300 to 400 local jobs). *Id.*
> A second hypothetical was posed to the VE assuming an individual the same age, education, and work experience and who had limitations consistent with Murr's testimony. (Tr. 260.) The VE testified "that individual would not be capable of his past work or any other work." *Id.*
> In response to questions from Murr's attorney, the VE testified that most jobs permit unscheduled breaks, but not absences of four days per month as predicted in Dr. Benedict's questionnaire. *Id.*; (*see also* Tr. 212.)

(Doc. 16 at 1-7).

Magistrate Judge White recommends that this Court affirm the final decision of the Commissioner denying Plaintiff's application for a Period of Disability, Disability Insurance Benefits, and Supplemental Security Income. Plaintiff filed an objection to the R&R on June 23, 2010, requesting that this Court not adopt the R&R, but remand for an award of benefits. For reasons discussed below, this Court agrees with the Magistrate Judge's findings that the Commissioner's denial of Plaintiff's application is supported by substantial evidence and, therefore, hereby adopts the recommendation in full. (Doc. 16).

**II. Standard of Review**

 **A. Review of an R&R**

Any party may object to a magistrate judge's proposed findings, recommendations, or report made pursuant to Fed. R. Civ. P. 72(b). The district judge to whom the case was assigned may review a report or specified proposed findings or recommendations of a magistrate judge, to which proper objection is made, and may accept, reject, or modify in whole or in part the findings or recommendations of the magistrate judge. Fed. R. Civ. P. 72.3(b). This Court has reviewed the findings of the Magistrate Judge *de novo*. *Hill v. Duriron Co.*, 656 F.2d 1208 (6th Cir. 1981).

### B. Disability standard

A claimant is entitled to receive supplemental security income benefits only when she establishes disability within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 423, 1381. A claimant is considered disabled when she cannot perform "substantial gainful employment by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505; *see id.* § 416.905.

A five-step sequential process, 20 C.F.R. § 404.1520, is employed by the ALJ to determine whether a claimant has a valid disability:

> First, plaintiff must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits. Second, plaintiff must show that she suffers from a "severe impairment" in order to warrant a finding of disability. . . . Third, if plaintiff is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, plaintiff is presumed to be disabled regardless of age, education or work experience. Fourth, if the plaintiff's impairment does not prevent her from doing her past relevant work, plaintiff is not disabled. For the fifth and final step, even if the plaintiff's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that plaintiff can perform, plaintiff is not disabled.

*Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007) (citing *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001)). If a claimant is found to be disabled or not disabled at any point in the evaluation process, the determination is made without completing the remaining steps. 20 C.F.R. § 404.1520(a).

"During the first four steps, the claimant has the burden of proof; this burden shifts to the Commissioner only at Step Five." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997) (citing *Young v. Sec'y of Health & Human Services*, 925 F.2d 146, 148 (6th Cir. 1990)).

In the instant case, at Step Two the ALJ found that Plaintiff had degenerative disc disease. However, at Step Three the ALJ determined that Plaintiff did not meet a listed impairment. Moreover, at Step Five, the ALJ determined that other work exists in the national economy that plaintiff can perform.

### C. Review of Commissioner's decision

Under 42 U.S.C. § 405(g), the ALJ's findings are conclusive unless this Court finds no substantial evidence exists to support the decision. *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence means more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (citing *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524, 535 (6th Cir. 1981)). Deference must be given to the ALJ's decision, "even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ." *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).

The Sixth Circuit has explained that the substantial evidence standard "presupposes that there is a zone of choice within which decision makers can go either way, without interference

8

from the court." *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986) (en banc) (citations and internal quotations omitted).

This Court may reverse the decision and remand for a new hearing if it determines that the ALJ's decision was not supported by substantial evidence. 42 U.S.C. § 405(g). This Court may also reverse the ALJ's decision and award benefits, but only when all essential factual issues have been resolved and the record unquestionably establishes a claimant's entitlement to benefits. *Faucher v. Sec'y of Health and Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

### III. Review of Plaintiff's Objections

In objecting to the R&R, Plaintiff complains that Dr. Benedict's RFC did not receive controlling weight according to Sixth Circuit precedent. ( Doc. 17 at 2.) Where a treating physician's opinion rests upon "medically acceptable clinical and laboratory diagnostic techniques" and is not contradicted by "'other substantial evidence in [the] case record,' it must be given 'controlling weight.'" *Hensley v. Astrue*, 573 F.3d 263, 266 (6th Cir. 2009) (quoting 20 C.F.R. § 404.1527(d)(2). However, "the Secretary is not bound by the treating physician's opinions" if they are not "supported by sufficient clinical findings [or] consistent with the evidence." *Bogle v. Sullivan*, 998 F.2d 342, 348 (6th Cir. 1993) (citation omitted).

Here, Plaintiff complains that the ALJ's rejection of a portion of Dr. Benedict's opinion lead to the denial of his claim. He points to several comments related to that opinion, but the only one which would have affected his claim is Dr. Benedict's description of the intensity of the seizures. According to the VE, Plaintiff missing four or more days of work per month would

9

preclude his finding work in the area.[3] (Tr. 260). The ALJ did not include this limitation in his determination of Plaintiff's RFC, despite Dr. Benedict's inclusion in his own RFC questionnaire. (TR. 17, 212). Even though Dr. Benedict stated that Plaintiff would have to miss four days of work per month, in the same questionnaire, he describes the seizures in the exact same way as the ALJ accepted and factored into his RFC: seizures of up to twenty seconds with an additional twenty seconds to recover averaging once or twice a week. (Tr. 17, 210-12). Further, the Plaintiff stated at the hearing that he had not had a grand mal seizure (one involving unconsciousness) in a year. (Tr. 253). Further, the ALJ also noted the lack of diagnostic testing related to Plaintiff's seizures (no EEG had been performed and a CT scan came back normal). (Tr. 16). Taking all the evidence together, Dr. Benedict's claim that Plaintiff would have to miss work for his seizures as much as four times per month is both unsupported by significant evidence in the record and inconsistent with Plaintiff's evidence. *See Hephner v. Matthews*, 574 F.2d 359, 362 (6th Cir. 1978) (record taken as a whole, not upon a single piece of evidence).

       Further, Plaintiff also objects to the manner in which the ALJ addressed Dr. Benedict's opinion. The ALJ must articulate his reasons for discounting a treating physician's opinion. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 245-46 (6th Cir. 2007); *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 547 (6th Cir. 2004). However, this requirement is not a blind formality and the ALJ's ruling may be upheld if its reasons may be found by claimant and a reviewing court, even if it does not strictly comply with the standard form for discussing the weight of treating physician opinions. *Friend v. Comm'r of Soc. Sec.*, 375 Fed. Appx. 543, 551 (6th Cir. 2010)

---

[3] The VE also stated that "limitations consistent with Mr. Murr's testimony" at the hearing before the ALJ would be unable to find work. (TR. 260). However, Plaintiff did not raise an objection to the ALJ's weight of his testimony.

10

(unpublished). Here, though Plaintiff may not like some of the reasons the ALJ invoked for discounting Dr. Benedict's opinion (such as medication compliance and alcohol use), other sufficient reasons were clearly articulated as mention above (for example, contradiction within the RFC and with Plaintiff's own description of his seizures as mentioned at Tr. 16-17). Plaintiff has not been sufficiently denied his procedural right to examine the reasons his claim was denied to warrant rejection of the ALJ's decision.

Finally, Plaintiff objects to the ALJ's weight of the opinion of Dr. Freihofer. Because Dr. Benedict and the Plaintiff himself have provided sufficient justification for the ALJ's RFC, the Court need address that objection no further.

**IV. Conclusion**

For the reasons discussed herein, the Court adopts the Report & Recommendation of the Magistrate Judge in its entirety. (Doc. 16). The Court affirms the ALJ's decision denying Plaintiff's application for disability insurance benefits.

IT IS SO ORDERED.

                                                s/ *David A. Katz*
                                                DAVID A. KATZ
                                                U. S. DISTRICT JUDGE